**ALPEX COMPUTER CORPORATION,**
**Plaintiff/Cross–Appellant,**

v.

**NINTENDO COMPANY LTD. and**
**Nintendo of America, Inc.,**
**Defendants–Appellants.**

Nos. 95–1191, 95–1229.

United States Court of Appeals,
Federal Circuit.

Nov. 6, 1996.

Rehearing Denied; Suggestion for
Rehearing In Banc Declined Jan. 15, 1997.

John L. Strauch, Jones, Day, Reavis, & Pogue, Cleveland, OH, argued for plaintiff/cross-appellant. With him on the brief were Barry L. Springel, Richard H. Sayler, and Joseph D. Pollack. Of counsel were Robert J. Hoerner and Marc L. Swartzbaugh.

Thomas G. Gallatin, Jr., Mudge Rose Guthrie Alexander & Ferdon L.L.P., and Herbert F. Schwartz, Fish & Neave, New York City, argued for defendants-appellants. With them on the briefs were John J. Kirby, Jr., Shelley B. O'Neill, and Robert J. Gunther, Jr., Mudge Rose Guthrie Alexander & Ferdon L.L.P. Of counsel was Larry S. Nixon, Nixon & Vanderhye, P.C., Arlington, VA.

Before ARCHER, Chief Judge, RICH, and NEWMAN, Circuit Judges.

ARCHER, Chief Judge.

Nintendo Company, Ltd. and Nintendo of America, Inc. (collectively Nintendo) appeal the January 6, 1995, judgment of the United States District Court for the Southern District of New York, *Alpex Computer Corp. v. Nintendo Co.*, 34 USPQ2d 1167 (S.D.N.Y. 1994), holding U.S. Patent No. 4,026,555 (the '555 patent), owned by Alpex Computer Corporation (Alpex), not invalid, willfully infringed, and awarding $253,641,445 in damages and interest. We affirm the judgment as to validity and reverse the judgment of infringement.

I.

This case deals with an invention within the art of video games. The video game industry began in the early 1970s and includes two branches, arcade video games and home video games. Arcade video games are large, expensive, coin-operated machines that are placed in high traffic areas such as amusement arcades. These machines are generally referred to as "dedicated" because they can play only one game. Home video games, in contrast, are small, relatively inexpensive devices that are easily connected to the antennae terminals of a standard television. The Magnavox Odyssey was the first home video game. It too was a dedicated

system playing only one game which was referred to as the "ball and paddle" because a dot of light bounced between two player-controlled vertical lines.

In early 1974, the inventors of the patent in suit conceived of a new microprocessor-based home video game system that used modular plug-in units—replaceable, read-only memory, or ROM, cartridges—to permit home video systems to play multiple games, including games with rotating images. The '555 patent on this invention issued to Alpex on May 31, 1977. The patented invention was commercialized in systems by Atari, Mattel, and Coleco.

In the early 1980s, Nintendo entered the home video game market with the Nintendo Entertainment System (NES). After the NES was featured at the 1985 Consumer Electronics Show, Alpex notified Nintendo of possible infringement of the '555 patent. Soon thereafter, in February 1986, Alpex filed suit against Nintendo for patent infringement. Over the next several years, Alpex and Nintendo conducted various pre-trial proceedings. During these proceedings, Nintendo requested certification of certain issues to this court for interlocutory appeal, which the district court granted. However, this court denied leave to appeal. *Alpex Computer Corp. v. Nintendo of America Inc.*, Misc. No. 320 (Fed.Cir. Sept. 2, 1992).

In order to resolve the outstanding questions of claim construction prior to trial, the district court held an evidentiary hearing with the assistance of a special master. The special master issued an initial report making specific recommendations on claim construction, which the district court adopted in part for purposes of instructing the jury. Following a four-week liability trial, the jury returned a verdict for Alpex. After this liability verdict, Nintendo filed a motion for judgment as a matter of law (JMOL) as to infringement and validity or, in the alternative, for a new trial. The damages trial followed before the same jury. The jury awarded Alpex a royalty of 6% which, when computed on the stipulated $3.4 billion of allegedly infringing products sold by Nintendo, resulted in a damage award of $253,641,445. Nintendo again filed motions for JMOL or a new trial and for a remittitur on damages. Alpex moved for entry of judgment and an award of prejudgment interest. The district court denied all of Nintendo's post-trial motions and entered judgment for Alpex with prejudgment interest.

Nintendo now appeals the judgment as to validity, infringement, and damages, and Alpex cross-appeals the amount of damages.

## II.

The '555 patent claims a keyboard-controlled apparatus for producing video signals by means of random access memory (RAM) with storage positions corresponding to each discrete position of the raster for a standard television receiver. Figure 2 of the '555 patent depicts the structure of the invention, as follows:

The television raster comprises numerous discrete dots or bars, approximately 32,000, which the cathode ray beam illuminates on a standard cycle, which in turn creates the image on the television screen. The patented invention requires sufficient RAM to accommodate each of the approximately 32,000 memory positions needed to represent the raster image. Thus, the RAM holds at least one "bit" of data for each position in the memory "map" of the raster. Accordingly, this video display system is called "bit-mapping." The advantage of this system, as disclosed in the patent, is that it provides for the representation of every image within the raster RAM, or display RAM, and thereby provides greater control of the display for the manipulation of complex images and symbols. To achieve this flexibility, however, bit-mapping requires the construction of each image within the display RAM before display, a process that requires the microprocessor to erase and rewrite each image. Because the microprocessor must refresh the display RAM for each frame to show the movement of images, the operation of the system is slowed down.

The accused NES with its game cartridges is also an apparatus for producing video signals by means of storage positions corresponding to discrete positions of the raster for a standard television receiver. A trial exhibit illustrates the NES:

The video display system for the NES does not include RAM with storage positions corresponding to *each* discrete position of the raster. Instead, the NES utilizes a patented picture processing unit, or PPU, to perform the generation of images on the screen. The PPU receives pre-formed, horizontal slices of data and places each slice in one of eight shift registers, each of which can store a maximum of 8 pixels. These slices of data are then processed directly to the screen. The PPU repeats this process to assemble the initial image on the screen. Thereafter it repeats the process as necessary to form changes in images throughout the progression of the game. Nintendo refers to the PPU as an "on-the-fly" system. It is undisputed that the NES video display system, using shift registers to process slices of images (as opposed to entire screens), is a faster means of displaying movement of images on the video screen than the bit-mapping of the RAM-based system of the '555 patent.

The claims at issue are 12 and 13 of the '555 patent:

> 12. Apparatus for playing games by displaying and manipulating player and ball image devices on the screen of a display tube, comprising
>
>> first means for generating a video signal representing a linear player image device aligned in a first direction,
>>
>> second means for generating a video signal representing a ball image device,
>>
>> manually operable game control means, and
>>
>> means responsive to said manually operable game control means for causing said first means to generate a video signal representing the player image device rotated so that it is aligned in a second direction different from said first direction.
>
> 13. Apparatus according to claim 12, wherein said means for causing includes programmed microprocessor means and a replaceable memory having program game instructions stored therein for controlling said microprocessor means, whereby different games may be played with said

apparatus by replacing said replaceable memory.

The parties dispute the proper claim construction of independent claim 12 (and thus dependent claim 13) and specifically the meaning and scope of "means for generating a video signal."

### III.

■ Claim construction is a matter of law, which we review de novo. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 988, 34 USPQ2d 1321, 1337 (Fed.Cir.1995) (in banc), *aff'd,* ── U.S. ──, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Here, the district court submitted the issue of claim construction to a special master. The special master construed the pertinent means-plus-function claims of the '555 patent based on the disclosed structure contained in the patent specification and drawings. *See* 35 U.S.C. § 112, ¶ 6 (1994). The following jury instruction with regard to the video display system claimed in the '555 patent was proposed by the special master:

> The structure corresponding to the elements of claims 12 and 13 for generating a video signal is the Figure 2 components without the television receiver and the keyboard. These components cooperate together to create a video signal as follows: The linear player image device and the ball image device to be displayed on the video unit 30 are stored as data within ROM 42A. The "intelligence" of the system is provided by micro-processor 40. The operation of the micro-processor 40 is under the control of a program stored in ROM 42A. Micro-processor 40 causes this information in ROM 42A to be written into RAM 32 by using the write control circuit 38. RAM 32 has discrete storage positions which correspond to each of the bars or pixels of the TV screen. TV interface 36 causes display RAM address 34 to scan each of these storage positions in display RAM 32 to provide the video signal to the TV receiver 30.

Alternatively, the special master recommended leaving the issue of claim construction to the jury. The district court chose only to adopt the first sentence of the special

master's recommended jury instruction, relegating the remainder of the claim construction issues to the jury.

After the jury returned a verdict of infringement, Nintendo challenged on motion for JMOL the interpretation that the jury appeared to give the claim in reaching its verdict, but the district court denied Nintendo's motion. The court seemed to adopt the entirety of the claim interpretation of the special master in ruling on the JMOL motion and held that there was sufficient evidence to support the jury's presumed claim construction. Nintendo argues that, by denying its JMOL, the district court approved an erroneous claim construction, allowing claims for a RAM-based, bit-map video display system to read on a device that used a shift register-based, on-the-fly video display system.[1]

Nintendo argues that the '555 patent requires the use of a RAM memory map for all of the 32,000 pixels in the raster, whereas the NES uses shift registers that only provide for a maximum of 64 pixels. Because of this difference in structure, Nintendo contends that there can be neither literal infringement nor infringement under the doctrine of equivalents. Nintendo further contends that Alpex is barred from claiming that the NES infringes the '555 patent because during prosecution Alpex distinguished the invention of the '555 patent from a relevant prior art patent using shift registers.

In prosecuting its patent application before the Patent and Trademark Office (PTO), Alpex specifically distinguished the RAM-based, bit-map video display structure of the '555 patent from a prior art patent, Okuda, which claimed a shift register-based video display structure. Alpex explained to the PTO that, unlike Alpex's bit-map system, the Okuda video display system comprised an entirely different structure than the Alpex system. Specifically, Alpex noted that Okuda was unable to modify selectively a single pixel on the screen. Alpex explained:

> Applicants' display system utilizes a random access memory (RAM) 32 which is

under the control of a micro-processor 40. When the keyboard is operated, as explained in the specification, micro-processor 40 extracts an appropriate image device from the read-only memory (ROM) 42A and transfers this particular image device directly into the appropriate location within the RAM 32. The random access capability is important since this enables the selected image device to be located directly in any desired area of the RAM 32.

Okuda, in contrast, does not use a random access memory but, instead, employs a series of shift registers as his refresh memory 17 which corresponds to applicants' RAM 32. Because random access to the shift registers is not possible, Okuda is unable to selectively modify a single bit in the memory 17 but, instead, must operate on a line at a time to modify the stored display data.

\* \* \* \* \* \*

Okuda contemplates modification of one line of data at a time and there is no provision for modifying a single "dot." The random access techniques of applicants' invention enables any single point on the TV screen to be altered at will (under control of the micro-processor).

The district court, adopting the recommendations of the special master, did not expressly consider these statements for purposes of claim construction. The special master's report had noted that, because Alpex had made the above cited distinction with regard to claims not asserted by Alpex, this aspect of the prosecution history could not be used for purposes of prosecution history estoppel. Nintendo contends that the statements regarding the Okuda prior art patent were relevant and should have been considered for purposes of claim construction even though they may not give rise to prosecution history estoppel as to asserted claims 12 and 13. Alpex says nothing about the Okuda patent with regard to claim construction. It only argues that Nintendo waived any argument

---

1. Nintendo also challenges two other issues of claim construction in the '555 patent, including whether the claim term "linear player image" was properly construed and whether the patent required an on-board ROM. In view of our holding herein, we need not decide these other claim construction issues.

pertaining to Okuda for purposes of prosecution history estoppel.

## IV.

■ Prosecution history is relevant not only for purposes of prosecution history estoppel but also for construing the meaning and scope of the claims. *See Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1270, 229 USPQ 805, 811 (Fed.Cir.1986) ("While it is true that the effect of prosecution history arises as an estoppel when applying infringement analysis under the doctrine of equivalents, the prosecution history can and should, where relevant, be assessed (along with, *e.g.*, claim language and specification) in properly interpreting claim language." (citations omitted)); *McGill Inc. v. John Zink Co.*, 736 F.2d 666, 673, 221 USPQ 944, 949 (Fed.Cir.1984) ("Prosecution history may be used not only in an estoppel context but also as a claim construction tool."), *overruled on other grounds, Markman*, 52 F.3d at 976, 979, 34 USPQ2d at 1327, 1329. Indeed, prosecution history is a proper claim construction tool. *See Markman*, 52 F.3d at 980, 34 USPQ2d at 1330 ("To construe claim language, the court should consider the patent's prosecution history...."); *Builders Concrete, Inc. v. Bremerton Concrete Prods. Co.*, 757 F.2d 255, 260, 225 USPQ 240, 243 (Fed.Cir.1985) ("[T]he prosecution history of all claims is not insulated from review in connection with determining the fair scope of [a] claim.... To hold otherwise would be to exalt form over substance and distort the logic of this jurisprudence, which serves as an effective and useful guide to the understanding of patent claims.").

■ In this case, the Okuda patent is directly relevant to claim construction. The prosecution history of the '555 patent shows that the examiner rejected claim 1 of the application as being anticipated by Okuda. Claim 1 specified a series of limitations in means-plus-function format to a display control apparatus utilizing a RAM-based, bitmap system. Alpex distinguished Okuda before the PTO based on the structural difference of a RAM-based versus a shift register-based video display system: "Claim 1, as amended, now clearly distinguishes over

Okuda. The claim requires a random access memory which, as indicated previously, is not disclosed in Okuda." The special master gave no weight to the statements made by Alpex regarding Okuda because the statements concerned different claims. The district court apparently adopted this reasoning, but we discern no reason why prosecution history relating to the structure of the video display in the means-plus-function limitations of claim 1 is not pertinent to the same structure of the same display system in the means-plus-function limitations of claims 12 and 13. Paragraph 6 of Section 112 requires that we construe a means-plus-function claim in view of the structure disclosed in the specification of the patent. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388, 21 USPQ2d 1383, 1387 (Fed.Cir.1992); *In re Iwahashi*, 888 F.2d 1370, 1375, 12 USPQ2d 1908, 1911 (Fed.Cir.1989). Statements made during the prosecution relating to structures disclosed in the specification are certainly relevant to determining the meaning of the means-plus-function limitations of the claims at issue.

The district court recognized that claims 12 and 13, and the specification of the '555 patent, call for the use of a RAM-based, bitmap video display system. Moreover, the statements made by Alpex during prosecution with regard to the Okuda prior art patent emphasize that Alpex claimed a video display system based on the use of RAM capable of modifying a single bit, or pixel, on the television receiver. These statements distinguish any video display system based on shift registers, as shift registers do not allow the selective modification of a single bit in memory, that is, a single pixel. It is undisputed that the NES utilized this type of video display system. Indeed, Alpex's own technical expert, Mr. Milner, testified that the NES utilized shift registers, not RAM. Further, Mr. Milner explained that the NES could not directly modify a single pixel. Thus, Mr. Milner's testimony confirms that random access capability is not possible by use of shift registers. In short, the structure and operation of the NES paralleled the structure and operation of the Okuda video display system.

Alpex attempts to distinguish Okuda from the NES because Okuda only allows the modification of horizontal lines on the raster, whereas the NES allows the modification of any 8–bit slice on the raster. This distinction, however, affects neither the structural similarities (both Okuda and the NES use shift registers) nor the pertinent functional similarities (both Okuda and the NES cannot modify a single pixel). Therefore, because Alpex admitted during prosecution that its claims do not cover a video display system based on shift registers as in Okuda, *i.e.*, it argued that a system based on shift registers is not structurally or functionally equivalent to a RAM based system that can randomly access a single bit, Alpex's claims cannot now be construed to cover the NES, which possesses the same structural and functional traits as Okuda.

## V.

On the jury verdict form, Interrogatory 1 asked the following: "Do you find that claims 12 and 13 require a structure that includes a display RAM which has discrete storage positions which correspond to each of the bars or pixels of the TV screen?" The jury answered this question in the affirmative. This response is consistent with and supported by the prosecution history of the '555 patent.

The jury then found that the accused products, the NES and most of its accompanying game cartridges, infringed claims 12 and 13 of the 555 patent, implicitly finding structural equivalence between a RAM-based, bit-map video display system and a shift register-based, NES system under § 112, ¶ 6. The district court determined that these findings were supported by substantial evidence and denied the motion for JMOL. *See Kearns v. Chrysler Corp.*, 32 F.3d 1541, 1547–48, 31 USPQ2d 1746, 1751 (Fed.Cir.1994) (deeming reversal proper "only if the jury's factual findings, presumed or express, are not supported by substantial evidence or, if they are, that the legal conclusions implied from the jury's verdict cannot in law be supported by those findings"); *Perkin–Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893, 221 USPQ 669, 673 (Fed.Cir.1984) ("[O]nly when the court is convinced upon the record before

the jury that reasonable persons would not have reached a verdict for the non-mover, should it grant the motion for [JMOL]."). We review the district court's JMOL ruling applying the same standard. *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 821, 23 USPQ2d 1426, 1431 (Fed.Cir.1992).

■ The district court held that Nintendo had literally infringed claims 12 and 13 of the '555 patent based primarily on the testimony of Alpex's expert Mr. Milner that the distinction between a bit-map system and the NES "is insignificant and insufficient to defeat a claim of equivalence under section 112(6)." Accordingly, the district court concluded that the NES is not only a functional equivalent but also a structural equivalent to the bit-map structure. For the reasons stated above, however, the NES cannot infringe claims 12 and 13 of the '555 patent as equivalents under § 112, ¶ 6, under a proper claim construction.

■ "As in all cases involving assertions of equivalency, wherein the patentee seeks to apply its [means-plus-function] claims to structures not disclosed by the patentee, the court is required to exercise judgment." *Texas Instruments, Inc. v. United States Int'l Trade Comm'n*, 846 F.2d 1369, 1371, 6 USPQ2d 1886, 1889 (Fed.Cir.1988). If an applicant specifically distinguishes a structure from what is claimed during prosecution, the applicant will be estopped from asserting a scope for the same claim that covers that structure. *Cf. Sofamor Danek Group, Inc. v. DePuy–Motech, Inc.*, 74 F.3d 1216, 1220, 37 USPQ2d 1529, 1531 (Fed.Cir. 1996). During the prosecution of the '555 patent, Alpex described the means-plus-function limitation under § 112, ¶ 6, as not covering a shift register-based video display system. On JMOL, the district court endorsed a contrary claim interpretation thereby allowing, in error, Alpex to avoid limitations made before the PTO. Just as prosecution history estoppel may act to estop an equivalence argument under the doctrine of equivalents, positions taken before the PTO may bar an inconsistent position on claim construction under § 112, ¶ 6. *See, e.g., Advance Transformer Co. v. Levinson*, 837 F.2d 1081, 1083, 5 USPQ2d 1600, 1602 (Fed.Cir.1988)

("Positions taken in order to obtain allowance of an applicant's claims are pertinent to an understanding and interpretation of the claims that are granted by the PTO, and may work an estoppel as against a subsequent different or broader interpretation.").

Moreover, while Mr. Milner's testimony purports to be an analysis of the structure of the specification and the accused device, it actually provides no more than an analysis of functional equivalency. Mr. Milner described the shift registers of the NES as storing "just one little slice of an object" to be imaged; whereas he said the bit-map system "stores the whole screen." He concluded that displaying a slice of an object is equivalent to displaying the "whole screen." Specifically, Mr. Milner testified that "the reason they are equivalent is by storing one line at a time and using it over and over and over again very quickly you can do the same thing." Thus, Mr. Milner concluded that by repeating the NES process the entire screen will eventually be imaged as is done with the bit map system. This is a conclusion, however, of equivalency of function—both systems store data and will eventually display an image on the whole screen. Mr. Milner did not compare the structure of the NES with the bit map structure disclosed in the specification. Moreover, the bit map structure was clearly distinguished over a shift register structure during the prosecution of the '555 patent.

Because Alpex defined its claims during the prosecution of the '555 patent as not covering a system using shift registers and because the testimony relied on by Alpex to establish infringement under § 112, ¶ 6, was based only on a functional, not a structural, analysis, we conclude the court erred in sustaining the jury verdict of literal infringement.

## VI.

The district court also denied Nintendo's motion for JMOL on the issue of infringement under the doctrine of equivalents primarily based on its conclusion that the jury could reasonably have found infringement under § 112, ¶ 6. The court reasoned that equivalence under the doctrine of equivalents is a slightly broader concept than equivalence under § 112, ¶ 6, and that, as a result, its discussion of equivalence for literal infringement applied equally to infringement under the doctrine of equivalents.

 While equivalency under the doctrine of equivalents and equivalency under § 112, ¶ 6, both relate to insubstantial changes, each has a separate origin, purpose and application. *Valmont Indus., Inc. v. Reinke Mfg. Co.*, 983 F.2d 1039, 1043–44, 25 USPQ2d 1451, 1454 (Fed.Cir.1993). Under § 112, the concern is whether the accused device, which performs the claimed function, has the same or an equivalent structure as the structure described in the specification corresponding to the claim's means. *D.M.I. Inc. v. Deere & Co.*, 755 F.2d 1570, 1575, 225 USPQ 236, 239 (Fed.Cir.1985). Under the doctrine of equivalents, on the other hand, the question is whether the accused device is only insubstantially different than the claimed device. *Hilton Davis Chem. Co. v. Warner–Jenkinson Co.*, 62 F.3d 1512, 1517, 35 USPQ2d 1641, 1644–45 (Fed.Cir.1995) (in banc), *cert. granted*, —— U.S. ——, 116 S.Ct. 1014, 134 L.Ed.2d 95 (1996). The latter question often turns on whether the accused device performs substantially the same function in substantially the same way to achieve substantially the same result. *See id.* at 1518, 35 USPQ2d at 1645.

 In this case, the court concluded, based on the testimony of Alpex's expert, Mr. Milner, that the jury's finding of infringement under the doctrine of equivalents was supported by substantial evidence. However, Mr. Milner's testimony that the claimed and accused devices were substantially the same in terms of function/way/result was merely conclusory as acknowledged by the district court. However, the court said that Mr. Milner's conclusory statements on function/way/result, when considered with his testimony in relation to infringement under the § 112, ¶ 6, were sufficient to establish infringement under the doctrine of equivalents.

As discussed earlier, however, Mr. Milner's testimony concerning § 112, ¶ 6, only related to equivalence of the functional result. Nei-

ther he nor the court considered whether the accused device and the claimed device operated in substantially the same way. Indeed, in describing equivalency for § 112, ¶ 6, purposes, Mr. Milner acknowledged that the accused and claimed devices do not operate in the same way. For example, Mr. Milner testified that the bit map system creates an image by copying the bit map (the entire stored image) into the display RAM and then reading out the entire image onto the full screen.[2] On the other hand, he explained that the NES creates an image by taking a piece of the image, placing it in temporary storage, and then reading only that piece of the image onto the screen.[3] According to Mr. Milner, by repeating this process "a little bit at a time" until the entire image is placed on the screen, the NES can achieve the same functional result as the bit-map system.[4] This testimony does not support a conclusion that the claimed system and the NES operate in substantially the same way.

The evidence in this case, therefore, does not support a finding of infringement under the doctrine of equivalents. The evidence fails to establish that the claimed and accused devices operate in the same way or that the differences between them are insubstantial. As discussed above, Alpex described its claims during the prosecution of the '555 patent as covering random access systems capable of changing a single bit. It did not and could not claim image generation by shift registers. As the Supreme Court has explained, the purpose of the doctrine of equivalents is to prevent others from avoiding the patent by merely making "unimportant and insubstantial changes and substitutions in the patent." *Graver Tank*, 339 U.S.

at 607, 70 S.Ct. at 856. It is not meant to cover systems that are clearly defined as outside the bounds of the claims. In this case, using shift registers, instead of RAM, to process data for video display, is not merely an unimportant and insubstantial change.

Accordingly, because there is a lack of substantial evidence to support a finding of infringement either literally or under the doctrine of equivalents, the district court's judgment as to infringement and damages is reversed. Alpex's cross-motion on damages is, therefore, moot.

### VII.

Nintendo also challenges the jury's finding that the '555 patent is not invalid. On JMOL, the district court made an exhaustive thirty-two page review of Nintendo's arguments relating to invalidity. We have carefully considered Nintendo's arguments and the district court's opinion on this issue and discern no error. Accordingly we affirm the judgment as to validity.

No costs.

*AFFIRMED–IN–PART* and *RE-VERSED–IN–PART.*

---

2. Mr. Milner testified that "if we want to display an image on the screen using the bit-map technique that is described in the '555 patent, what we do is we make a copy ahead of time of this bit-map into this display RAM. And essentially what we do is we have locations in this RAM corresponding to each position on the screen." He went on to describe that "a full screen bit-map transfers an image that is stored in this memory, loaded by the microprocessor into this display RAM, put out on to the TV screen at the right time to make the picture of the little guy."

3. Mr. Milner said about the NES system that "[t]hey don't hold the whole line. One of them holds this top line here, the other one holds this

blank top line here. When the beam is going across and it's time to display these when the positions match, this little bit of information that had been in this temporary shift register gets spit out, goes through some additional circuitry and turns the beam on and off on the screen to paint the top of his head."

4. Specifically, Mr. Milner said that if the NES process is performed "over and over," it also will have put an entire image on the screen. As he described "[w]e do one line and then the next and then the next, using the same hardware over and over, but still storing it until—little bit at a time—until we have put the entire image out to the screen."